```
 1              IN THE UNITED STATES DISTRICT COURT
                   MIDDLE DISTRICT OF GEORGIA
 2                     (MACON DIVISION)

 3   CERTUS BANK, N.A., as successor )
     by assignment to ATLANTIC       )
 4   SOUTHERN BANK,                   )
                                      )
 5             Plaintiff,             )
                                      )   CIVIL ACTION FILE
 6        vs.                         )
                                      )   NO. 5:14-cv-00069-CAR
 7   GENE DUNWODY, JR., GENE DUNWODY, )
     SR., JACK W. JENKINS, W. TONY    )
 8   LONG, and L. ROBERT LOVETT,      )
                                      )
 9             Defendants.            )

10   _____

11          DEPOSITION OF EUGENE C. DUNWODY, JR.
                     OCTOBER 30, 2014
12                      9:30 A.M.
13   _____

14

15

16

17

18

19

20

21

22

23

24

25
```



CERTIFIED COURT REPORTERS

The Pinnacle, Suite 500 ● 3455 Peachtree Road, N.E. ● Atlanta, GA 30326 ● www.premierreporting.com
404.237.1990
800.317.5773

```
 1            IN THE UNITED STATES DISTRICT COURT
                MIDDLE DISTRICT OF GEORGIA
 2                   (MACON DIVISION)

 3   CERTUS BANK, N.A., as successor )
     by assignment to ATLANTIC       )
 4   SOUTHERN BANK,                   )
                                      )
 5            Plaintiff,              )
                                      )  CIVIL ACTION FILE
 6        vs.                         )
                                      )  NO. 5:14-cv-00069-CAR
 7   GENE DUNWODY, JR., GENE DUNWODY,)
     SR., JACK W. JENKINS, W. TONY    )
 8   LONG, and L. ROBERT LOVETT,      )
                                      )
 9            Defendants.             )

10   _____

11          DEPOSITION OF EUGENE C. DUNWODY, JR.
                    OCTOBER 30, 2014
12                    9:30 A.M.
     _____
13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 2

```
 1   APPEARANCES OF COUNSEL

 2        On behalf of the Plaintiff:

 3            Sean Gordon, Esq.
              Greenberg Traurig
 4            Terminus 400
              3333 Piedmont Road, NE
 5            Suite 2500
              Atlanta, Georgia 30305
 6            gordonsa@gtlaw.com
              678-553-2100
 7
          On behalf of the Defendants:
 8
              Wesley J. Boyer, Esq.
 9            Katz, Flatau & Boyer
              355 Cotton Avenue
10            Macon, Georgia 31201
              wjboyer_2000@yahoo.com
11            478-742-6481

12                      * * *

13                INDEX TO EXHIBITS

14   23       EMAIL CHAIN                     19

15   24       EMAIL CHAIN                     20

16   25       SKETCH                          31

17                      * * *

18        MR. SMITH:  We are on the record in the

19   case of CertusBank, NA, a successor by

20   assignment to Atlantic Southern Bank versus

21   Gene Dunwody, Jr., et al.

22        This is Case No. 514-cv-00069-CAR in the

23   Middle District of Georgia.  And this is the

24   deposition of Mr. Dunwody and also the entity

25   Capricorn Center, LLC by designation 30(b)(6)
```

Page 3

1     witness, correct?

2          MR. BOYER:  Well, I thought you had

3     subpoenaed a witness for deposition in Atlanta

4     for the 30(b)(6).

5          I mean, we can go ahead and let him do

6     that now and avoid that.

7          MR. SMITH:  Do you want to go off the

8     record for a minute.

9        (Whereupon, a discussion ensued off the record.)

10                EUGENE C. DUNWODY, JR.,

11    having been first duly sworn, was deposed and testified as

12    follows:

13                       EXAMINATION

14    BY MR. SMITH:

15        **Q    Can you please state your name for the**

16    **record?**

17        A    Eugene Cox Dunwody, Jr.

18        **Q    Okay.  And there was some discussion off**

19    **the record concerning you being designated as the**

20    **30(b)(6) witness, the corporate designated**

21    **representative, to testify for Capricorn Center, LLC**

22    **today.**

23          MR. SMITH:  Mr. Boyer; is that correct?

24          MR. BOYER:  That's correct.

25          MR. SMITH:  Okay.  So Mr. Dunwody is

1          testifying today in his individual capacity as

2          well as the 30(b)(6) representative for the

3          entity Capricorn Center.

4     BY MR. SMITH:

5          **Q    Mr. Dunwody, when was Capricorn Center**

6     **formed, if you recall?**

7          A    I believe it was in 2007.

8          **Q    And what was the purpose of that entity?**

9     **What type of business was it in?**

10         A    It was a group of individuals interested

11    in the redevelopment of downtown Macon that came

12    together to try to develop a piece of property that

13    had been vacant downtown for decades.

14              The property was owned by Mercer

15    University and the group purchased the property with

16    the idea of possibly redeveloping it and saving the

17    old historic Capricorn Studios.

18         **Q    And who were the members of the entity?**

19         A    The general partner, who I'm standing in

20    for right now is Dr. Ronald Connors.

21              He's not here today because he doesn't

22    really have the memory anymore of how this

23    project -- you know, the details of this project.

24              So he was the managing partner, myself,

25    Jack Jenkins, Rob Ballard, Dr. Allen Justice, Bob

Page 5

1    Lovett and Tony Long.

2        Q    And all of those people that you just

3    mentioned, they each held some kind of membership

4    interest in Capricorn?

5        A    Yes.  Each -- each person in the group

6    owned -- Dr. Connors owned 33.3 percent of the

7    project.  Dunwody, Jenkins, Lovett and Long owned

8    11.1 percent.

9              And Ballard and Justice owned

10   5.05 percent.

11             MR. BOYER:  Each?

12             THE WITNESS:  Each.

13             THE COURT REPORTER:  I'm sorry.  How much.

14             THE WITNESS:  5.05 percent.

15   BY MR. SMITH:

16       Q    And for purposes of the redevelopment that

17   you mentioned earlier, did Capricorn Center, LLC

18   take out loans from Atlantic Southern Bank?

19       A    Yes.

20             (Whereupon, previously marked Exhibit 1
                    was entered.)

21   BY MR. SMITH:

22       Q    Okay.  If you could turn to Exhibit 1,

23   please.

24       A    Okay.

25       Q    This is a promissory note in the amount of

Page 6

1    $176,452.13 dated April 16th, 2010, and this is

2    signed by Capricorn Center, LLC through Mr. Connors,

3    correct?

4        A    That's correct.

5        Q    Okay.  Is this a true and correct copy of

6    the document that Capricorn Center, LLC signed?

7        A    Yes.

8                (Whereupon, previously marked Exhibit 2
                    was entered.)

9    BY MR. SMITH:

10       Q    Okay.  If you could turn to Exhibit 2,

11   please.

12       A    Can I make a comment?  The concern I

13   mentioned off the record is that I believe that this

14   loan to Capricorn Center is for 615 5th Street,

15   but -- which is part of Capricorn Center.

16       Q    Okay.  Was that property that was held by

17   Capricorn Center?

18       A    Yes.

19       Q    Okay.  If you could turn to Exhibit 2,

20   please.  This is a promissory note dated

21   April 16th, 2010 in the amount of $176,452.13,

22   correct?

23       A    Yes, sir.

24       Q    And did Capricorn Center, LLC sign this

25   document through Mr. Connors as manager?

Page 7

```
 1      A    Yes.
 2      Q    Is this a true and correct copy of the
 3 document that Capricorn Center, LLC signed?
 4      A    Yes.
 5               (Whereupon, previously marked Exhibit 3
                    was entered.)
 6 BY MR. SMITH:
 7      Q    Okay.  If you turn to Exhibit 3, please.
 8 This is a Deed to Secure Debt -- I'm trying to find
 9 the date.
10           Okay, this is a Deed to Secure Debt dated
11 April 16th, 2008 signed by Capricorn Center, LLC in
12 favor of Atlantic Southern Bank, correct?
13      A    That's correct.
14      Q    And this is signed by Ron Connors on
15 behalf of Capricorn, correct?
16      A    Yes.
17      Q    Is this a true and correct copy of the
18 document that Capricorn Center, LLC signed?
19      A    Yes.  But looking at this Deed to Secure
20 Debt, again, I'm not positive but I believe that
21 this Deed to Secure Debt should have been for 615
22 5th Street and I'm not sure why it's not.
23      Q    Well, it could just be the order of the
24 exhibits that I have.
25      A    Okay, okay, sorry.
```

Page 8

```
 1       Q    I'm just asking, again, is this a document
 2   that the company signed?
 3       A    Correct.  Yes.
 4            (Whereupon, previously marked Exhibit 9
                was entered.)
 5   BY MR. SMITH:
 6       Q    Okay.  If you could flip to Exhibit 9,
 7   please.
 8       A    Okay.
 9       Q    This is a Guaranty that you signed on
10   April 16th, 2010 in favor of Atlantic Southern
11   Bank, correct?
12       A    Yes.
13       Q    Is that your signature on the third page?
14       A    Yes.
15       Q    And are those your initials at the bottom
16   of each page?
17       A    Right, yes.  And I wanted to point out
18   that there was a limited liability to each partner,
19   including myself, on each loan.
20       Q    Are you talking about the language in
21   Section 2?
22       A    Yes, sir.  I was just pointing that out.
23       Q    Sure.  And -- and this -- this -- let's
24   just call it a cap.  It says:  "My liability will
25   not exceed $33,045," et cetera.
```

Page 9

1          Did that cap relate to the $176,452.13

2    note that was dated the same day?

3        A    Yes, and it related to all of the notes

4    that we had on this -- on this project.  Every --

5    every partner had a limited -- a limited liability.

6        Q    Okay.  You're talking about the 615

7    address that you mentioned?

8        A    615, 560, 534, 50 -- all of them.

9    Everything that had -- every single loan that

10   Capricorn Center signed had a limited guaranty.

11   Each partner had a limited guaranty of their

12   percentage of ownership plus 25 percent, as I

13   recall.

14       Q    Okay.  But this particular guaranty is

15   dated April 16th, 2010?

16       A    Correct.

17       Q    And it's dated the same day as the

18   $176,000 note that's at Exhibit 1, correct?

19       A    Yes.

20       Q    And did you sign this guaranty in

21   connection with that note?

22       A    Yes.

23              (Whereupon, previously marked Exhibit 10
                   was entered.)

24   BY MR. SMITH:

25       Q    Okay.  If you could turn to Exhibit 10,

Page 10

1    please.

2          This is a Commercial Loan Agreement dated

3    April 28th, 2011 in the amount of $1,286,369.29,

4    correct?

5       A    Correct.

6       Q    And this document is signed by Ron Connors

7    on behalf of Capricorn Center, LLC as Manager of

8    that entity, correct?

9       A    Yes.

10      Q    Is this a true and correct copy of the

11   document that Capricorn Center, LLC signed?

12      A    Yes.

13          (Whereupon, previously marked Exhibit 11
                was entered.)

14   BY MR. SMITH:

15      Q    Okay.  If you could turn to Exhibit 11,

16   please.

17      A    Okay.

18      Q    This is a Promissory Note dated

19   April 28th, 2011 in the principal amount of

20   $1,286,369.29 signed by Capricorn Center, LLC

21   through its Manager, Ron Connors, correct?

22      A    Correct.

23      Q    Is this a true and correct copy of the

24   document that Capricorn Center, LLC signed?

25      A    Yes.

Page 11

1    Q    Okay.  And --

2    A    It's got the same Limited Guaranty on it.

3    Q    Well, let's look at that.  Your Guaranty

4    for this particular note --

5    A    $241,280.

6    Q    Yes.  If you could just wait until I ask

7    the question, please.

8              (Whereupon, previously marked Exhibit 16
                  was entered.)

9    BY MR. SMITH:

10   Q    If you turn to Exhibit 16, this is a

11   Guaranty that you signed on April 28th, 2011 --

12            MR. BOYER:  I think you're looking at the

13        Senior's Guaranty.

14            MR. SMITH:  Oh, I'm sorry.  Let's look at

15        Exhibit 17.  I apologize.

16            Thank you, Wes.

17            THE WITNESS:  Wes, please remind everybody

18        else that they have a Limited Guaranty, too.  I

19        don't think people realize that.

20            (Whereupon, previously marked Exhibit 17
                  was entered.)

21   BY MR. SMITH:

22   Q    Mr. Dunwody, Exhibit 17 is a Guaranty that

23   you signed dated April 28th, 2011, correct?

24   A    Yes.

25   Q    And this was a Guaranty in favor of

1    Atlantic Southern Bank for what is referenced as

2    Note No. ▓▓▓▓▓4300, correct?

3        A    Yes.

4        Q    And that is the note that is referenced at

5    Exhibit 11, correct?

6        A    Yes.

7        Q    And this Guaranty as to that note has a

8    cap of $241,280, correct?

9        A    Yes.

10        Q    Okay.  Then, as we go back to the

11    Guaranty -- the earlier Guaranty at Exhibit 9, this

12    Guaranty references Note No. 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, which was

13    signed that same day, correct?

14        A    Correct.

15        Q    And the cap for that particular note was

16    $33,045, correct?

17        A    Correct.

18        Q    Okay.  So is it your understanding that

19    the caps that are in these Guaranties relate to the

20    notes that referenced in the Guaranties?

21        A    Yes.

22        Q    Did Capricorn Center, LLC ever pay all of

23    the money back that it was lent by Atlantic

24    Southern?

25        A    They never paid all of the money back.

Page 13

```
 1   They paid some of the money back.

 2        Q    Each of the notes that you've testified

 3   about, the first one, the $176,000 note, references

 4   a maturity date of April 16th, 2011.  This was at

 5   exhibit -- I believe it was Exhibit 2.

 6             Yes, Exhibit 2, the $176,000 note, that

 7   references an April 16th, 2011 maturity date?

 8        A    Right.

 9        Q    Do you have any reason to believe that the

10   loan did not mature on that day?

11        A    No.

12        Q    And as to the other note, the $1.2 million

13   note and change which is at Exhibit 11, that note

14   has a maturity date, stated at the top, of

15   April 28th, 2012.

16             Do you have any reason to believe that the

17   note did not mature on that date?

18        A    No.

19        Q    Was it your understanding, that if there

20   were still amounts owing on these two notes, that

21   the guarantors, including yourself, would have to

22   pay those monies back personally up to the cap

23   amounts?

24        A    I did -- I did understand that.  The

25   problem was was that we were told, that when they
```

Page 14

1   were threatening to foreclose, that they were not

2   going to -- there wouldn't be a deficiency.

3          And I was told that by Mark Clegg for

4   several months, and that's where, you know, we felt

5   like we were misled.

6          I received an E-mail from him one week

7   before the foreclosure -- the actual foreclosure

8   saying that they had changed their mind.  I think

9   you have a copy of that.

10          Had we known that the bank was going to

11   come after us, we would have tried to make other

12   arrangements on this piece of property.

**13   Q   Was there any formal written agreement**

**14   signed by the parties that effected a change in what**

**15   you're talking about?**

16   A   Many conversations.  And I had -- you

17   know, he told me that's what he was going to do,

18   that the they -- they had -- that the property was

19   worth more than what we had owed, that we had paid

20   off almost a million dollars on it and had been

21   paying interest on it for years.

22          And he indicated that there wouldn't be a

23   deficiency.  And I -- just that's all verbal, but he

24   sent me an E-mail that stated, you know, the week

25   before that I know I've been telling you that

1  there's a deficiency -- there wouldn't be a

2  deficiency, but now there is one.

3        And I didn't have the time to put anything

4  together, and had I known that that was going to

5  happen months earlier, I might have been able to

6  make other arrangements is all I'm saying.

7        No, we owed the money.  I think the

8  property is worth more than this amount right now.

9  I know it is.  There's contracts on the property

10  right now for more than it's worth -- more than is

11  owed right now today, because I'm working for the

12  people.  So I know.

13        I mean, the bank just bought this stuff

14  back in.  They told us it was going to be all right.

15  They had appraisals that said that it was worth more

16  money.

17        And, you know, as an indication, what's

18  really funny about one of these properties at 504

19  MLK is they put it on the market for $200,000 more

20  the day they closed on it -- the day they

21  foreclosed, they knew it was worth more money.

22      **Q    The foreclosure sale was open to the**

23  **public, correct?**

24      A    Yeah, I mean, as open as a foreclosure is.

25      **Q    Yeah, so at that time --**

1      A     I'm not debating the foreclosures.

2  Foreclosures, I think, are poorly done, so, I mean,

3  that's beside it, but ...

4      **Q     But I'm just asking you:  You don't have**

5  **any reason to believe that the sale of the**

6  **collateral that secured these various notes didn't**

7  **go forward in the public, that anybody that wanted**

8  **to could bid?**

9      A     The sale did go forward for sale to the

10  public.

11     **Q     Okay.**

12     A     Not many people in the world right now

13  walking around with a million dollars in cash.

14                  (Whereupon, previously marked Exhibit 21
                        was entered.)

15  BY MR. SMITH:

16     **Q     Okay.  Can you turn to Exhibit 21, please.**

17     A     Oh, boy, you skipped a big one.  Okay.

18     **Q     This is a letter dated August 7th, 2012**

19  **addressed to various parties, including yourself.**

20        **Do you recall receiving a copy of this**

21  **letter?**

22     A     Yes.

23     **Q     Is this a true and correct copy of a**

24  **letter that you received, as far as you know?**

25     A     Yes.

1                    (Whereupon, previously marked Exhibit 22
                          was entered.)

2    BY MR. SMITH:

3         Q    Okay.  And please turn to Exhibit 22.

4    This is also a letter dated August 17th, 2012,

5    also sent to you amongst other parties.

6         A    Right.

7         Q    Do you recall receiving a copy of this

8    letter?

9         A    Yes, I recall it very well, because we

10   actually gave the bank $50,000 to stall the

11   foreclosure in August.

12              We were never credited properly for that

13   amount.  I remember this well.

14        Q    Okay.  In these two letters there are

15   amounts that are asserted as outstanding as of the

16   date of each letter under the two notes --

17        A    Right.

18        Q    -- that you have testified to.

19              Do you have any reason to believe, that as

20   of the date of these letters, that these amounts

21   that are asserted here are incorrect?

22        A    No, with the exception of the $50,000 that

23   we paid Mike Wing during that time, that some of

24   that accrued interest was paid on these notes.

25        Q    Are you sure that that payment was for

Page 18

 1    these notes?

 2        A    Absolutely.  Well, that's a good question,

 3    because when I was in Mr. Wing's -- in his presence,

 4    when I was trying to convince them not to foreclose

 5    on this property, he said I had to give him a

 6    $50,000 check and -- to keep from foreclosing on the

 7    properties.

 8             And I said, "Can you tell me how you are

 9    going to break it out?"  And he said, "No, I can't."

10    And I said, "Well" -- and the attorney in the room,

11    David Hollingsworth and Wes was on the phone back

12    and forth.

13             David says, "We need some kind of letter

14    stating what -- where the money is going."  And he

15    said, "If you don't give me the $50,000, I'm

16    foreclosing on this property."

17             And that's -- we never -- we never got a

18    formal letter of how that money was credited.  I've

19    told you this before.

20             THE WITNESS:  That -- that's what it is,

21        right?

22             MR. BOYER:  Let's go off the record just a

23        second.

24        (Whereupon, a discussion ensued off the record.)

25    BY MR. SMITH:

Page 19

```
 1        Q    We're back on the record.  Off record
 2   there were a couple of documents that counsel for
 3   Mr. Dunwody has graciously provided.
 4             I'm going to mark the first one as No. 23.
 5                     (Whereupon, marked by the court
                        reporter for identification purposes,
 6                     Exhibit No. 23.)
 7             THE WITNESS:  Wes, did you provide me with
 8       a copy?
 9             MR. SMITH:  I'm going to hand it to you.
10             MR. BOYER:  No.  You provided it to me,
11       actually.
12   BY MR. SMITH:
13        Q    Okay.  Mr. Dunwody, you had testified
14   earlier in the deposition that there was a written
15   communication from CertusBank concerning whether
16   there was going to be a deficiency -- whether the
17   bank thought there was going to be a deficiency
18   under this loan.
19             Is this the E-mail, written communication,
20   that you were referring to?
21        A    Yes.
22        Q    Okay.  And is this document a true and
23   correct copy of the E-mail that you received from
24   Mr. Clegg from CertusBank?
25        A    Yes.  And this is -- this came after, you
```

Page 20

1   know, conversations probably from July of 2012 up

2   until November that we had where he says:  "One

3   thing you should -- in the past I've mentioned that

4   there would likely be a deficiency."  He said:

5   "There was a mistake."

6        Q    The doc -- yes, the E-mail suggests that

7   when he previously told you there would likely be no

8   deficiency that they had included some other

9   property in the appraisal that was not actually to

10  be foreclosed on and was not collateral or something

11  like that?

12       A    Right.  And I called him and I said,

13  "Look, can you postpone this -- this foreclosure so

14  we can try to make some other kinds of

15  arrangements."  And he said, "No."

16       Q    And then -- but I just want to clarify:

17  Other than this written E-mail, there wasn't any

18  written communication to that effect?

19       A    No, not that I remember.  But I will look.

20  When we get to court, if I've produced something,

21  I'll give it to you.

22                  (Whereupon, marked by the court
                    reporter for identification purposes,
23                  Exhibit No. 24.)

24  BY MR. SMITH:

25       Q    Okay.  And I'm going to mark now as No. 24

Page 21

1    another E-mail.  If you want to take a minute and

2    just read through that to refresh your recollection

3    of that correspondence, please.

4        A    Okay.

5        Q    Now, I believe that E-mail was from Mr.

6    Wing, who's a former attorney of Greenberg, my firm.

7             He had sent that to your counsel, correct?

8        A    Right.

9        Q    I don't have the document in front of me,

10   but --

11       A    Yeah, no.  He sent it to my counsel.  I'm

12   sure Wes mentioned that to me.

13       Q    Okay.

14       A    But I did -- I was not copied for some

15   reason.

16       Q    Oh, I see that now.  You were not copied

17   on this E-mail.

18             But, as you read this E-mail, is

19   everything that Mr. Wing is saying in this E-mail is

20   correct in terms of what the understanding was with

21   regard to the foreclosures of those properties and

22   the payment of the $50,000?

23       A    Well, it was never -- he never told me

24   what it was going for at the time that he took the

25   check from me.

Page 22

```
 1                    But these are properties that I used to

 2     own.

 3          Q     Or that the companies used to own?

 4          A     Yes.  I'm sorry.  Yes, uh-huh.

 5          Q     And, basically, I think what Mr. Wing is

 6     saying in that E-mail is that this is confirming

 7     that the foreclosures for these various entities and

 8     the property that they owned are going to be -- are

 9     not going to go forward on that particular

10     foreclosure date in exchange for the $50,000,

11     correct?

12          A     That's correct, yes.

13          Q     There was not an understanding that they

14     couldn't be foreclosed on at some later point,

15     correct?

16          A     That's correct.

17          Q     And, to your knowledge, did the bank honor

18     this -- what Mr. Wing is referencing in the E-mail

19     in terms of none of these foreclosures went forward

20     that day?

21          A     That's correct.

22                    (Whereupon, previously marked Exhibits 19
                          entered.)
23     BY MR. SMITH:

24          Q     Okay.  If you could turn to Exhibit 19,

25     please.
```

1          And just for the record, Mr. Boyer had

2    handed me this E-mail that I believe was addressed

3    to him.  You're the deponent, but do you have any

4    reason to believe this is not a true and correct

5    copy of the document that Mr. Wing sent to

6    Mr. Boyer?

7        A    No.

8             MR. SMITH:  I'm not going to depose you

9        about it because that's not --

10            MR. BOYER:  We won't.

11            MR. SMITH:  That is not what I'm here to

12       do.

13            MR. BOYER:  We won't give you a hard time

14       about that document.

15            THE WITNESS:  Just want credit for the 50

16       on this project.

17   BY MR. SMITH:

18       Q    If you could turn to Paragraph 43 of the

19   Complaint which is on Page 6 of the Complaint.

20       A    Right.

21       Q    And this is asserting that there are

22   amounts outstanding under the first note, which was

23   the $176,752.13 note, as of February 18th, 2014.

24            As you look at this today, do you have any

25   reason to believe, one way or the other, that these

Page 24

1    amounts are incorrect?

2        A    No.

3        Q    Okay.  And if you could also look at

4    Paragraph 73.  This is asserting amounts outstanding

5    under the second note, which was the $1.2 million

6    plus note.

7             Do you have any reason to believe that the

8    amounts stated as outstanding here are incorrect?

9        A    Is this the $176,000 note originally or

10   76, because it says 76,122?

11       Q    Yes, the Paragraph 43, the one you just

12   testified to, is referring to Note 1, which is the

13   $176,000 note.  That is what is alleged.

14            MR. BOYER:  And let me get you to clarify

15       that as to what point in time you're referring

16       to.

17            MR. SMITH:  I'm asking as of the

18       February 18th, 2014, because that's what it

19       says right here.

20            MR. BOYER:  Okay.

21            MR. SMITH:  So I'm just asking.  We've

22       alleged that, as of February 18, 2014, these

23       are the amounts that were outstanding under

24       Note 2.  I'm talking about Paragraph 73.

25            THE WITNESS:  I -- I don't know what the

```
1          108,000 in accrued fees and charges would be.
2          I'm not sure why the principals of 176 -- I'm
3          not -- I just need to understand this.
4              Under 43 it says the principal is
5          176,752.13 and then under 73 it says the
6          principal is 76,266.
7              So what is that -- how could that be
8          different?
9   BY MR. SMITH:
10      Q    Well, they are two different notes.
11      A    Okay.
12      Q    It's not one amount for -- for all the
13  debt.  It's two different notes that are broken
14  down.
15      A    So there's a third note then, correct?
16      Q    Well, there may be, but the Complaint
17  here -- I'll represent to you that the Complaint is
18  suing on the two notes that you've testified to.
19      A    I've been testifying about a 1.286 million
20  note and a $176,000 note.
21      Q    Yes.
22      A    And then now we've got another $76,000
23  note.
24      Q    No, no, no.  What this -- let me rephrase
25  the question.
```

Page 26

1          What Paragraph 73 is contending that of

2     the $1.2 million note, this is what's left.

3          A    Got it.  Okay.  I'm sorry.  This is what's

4     based on after you-all --

5          Q    Yes.

6          A    -- took the --

7          Q    Yes.

8          A    Okay.

9          Q    Yes.  So what Paragraph 73 is alleging is,

10    that as of February 18th under the $1.2 million

11    note that you testified to earlier, these are the

12    amounts that the bank is contending is outstanding.

13              And my question to you is:  Do you have

14    any reason to believe, one way or the other, that

15    this is correct or incorrect?

16         A    No.

17         Q    Okay.  So you don't have any reason to

18    dispute that it is a correct amount?

19         A    It's a correct amount according to the

20    bank.  But I don't -- I don't see how -- can we go

21    off the record, because I'm just confused

22    mathematically here or do you just want to --

23         Q    Well, first of all, I'd like the record to

24    reflect somebody has walked into the room.

25         A    It's another attorney.

Page 27

1              MR. SMITH:  Bob Lovett?  Can we let on the

2          record that Mr. Lovett has walked into the

3          room.

4              And let's go off the record for a second.

5          (Whereupon, a discussion ensued off the record.)

6     BY MR. SMITH:

7      Q    I'm not trying to trick you on any of

8     these questions.  Let's start again.

9              Paragraph 73.  It says:  "As of

10    February 18th, 2014, principal accrued but unpaid

11    interest and accrued fees and charges outstanding

12    under Note 2 are as follows."

13             Now, before you answer, Note 2 is

14    referring to the $1.2 million -- and I say 1.2, it's

15    more than that, but, abbreviated, $1.2 million note

16    that you testified to earlier.

17             So my question to you is:  Do you have any

18    reason to believe the amounts set forth in Paragraph

19    73 -- let's start with the principal.

20             Do you have any reason to believe that the

21    principal that's contended as being outstanding as

22    of February 18th, 2014 is incorrect?

23     A    Yes, I think it's incorrect.

24     Q    Okay.  And why do you think that?

25     A    Because I think that the property, at the

1    time of the foreclosure, along with the extra fees

2    that had been paid, that the property was worth more

3    than what we owed on it.

4          And I apologize for the confusion.  I

5    thought this was a third loan.  If you go back to

6    43 --

7    **Q    Yes.**

8    A    -- I feel like that's the wrong number,

9    too, because I'm not sure -- I think there's -- I

10   think that this loan was for the property at 615 5th

11   Street, and we're not getting the credit for the buy

12   back of that piece of property, as well.

13         So, I think if you total up what

14   everything was bought back in at, I think the bank,

15   really technically, had a profit in this and we

16   shouldn't pay anything.

17   **Q    Did Capricorn ever sign a security deed**

18   **for this six -- you said it's 615 what street?**

19   A    Fifth street.

20   **Q    Oh, 615 5th Street.**

21   A    Yes.  Sorry.  Right, okay.  On this

22   Exhibit 24, 615 5th Street, for whatever reason, is

23   not tied in with Capricorn Center.

24         And Capricorn Center was -- this piece of

25   property, even though it was several parcels, and as

Page 29

1  much as it's in a historic downtown, it was owned by

2  one entity and we purchased all the property at one

3  time and Capricorn Center owned that property.

4        So I'm believing that this 615 5th Street

5  loan -- it's my understanding that that was the

6  $176,000 loan, but I could be -- I could be wrong.

7        So, I guess my point is if you total up

8  all -- when the CertusBank's shell corporation real

9  estate company bought the property back in, that

10  they bought the property back for more than what we

11  owed is what I'm saying.

12        MR. SMITH:  Let's go off the record.

13        (Whereupon, a discussion ensued off the record.)

14  BY MR. SMITH:

15    **Q    Mr. Dunwody, let's first talk about the**

16  **property that you said you believed was worth more**

17  **and that the bank didn't apply enough to the loan.**

18        **Is that -- for Note 2, for the**

19  **$1.2 million note.  Let's talk about that first.**

20    A    Well, I think there's confusion because I

21  think all of it was tied together as one piece of

22  property is what I'm trying to say.

23        There were -- there were -- at the time

24  that we borrowed the money on the two loans we

25  owned -- I wish I had a site plan, but we owned -- I

Page 30

1   can do an exhibit, 25.

2        **Q    Let the record reflect witness is -- that**

3   **the deponent is drawing something on a yellow legal**

4   **pad.**

5            THE WITNESS:  Can you tell me where in the

6        exhibits on the loans they had the addresses of

7        the properties?

8   BY MR. SMITH:

9        **Q    If you turn to Exhibit 3.**

10           MR. BOYER:  Exhibit A.

11           THE WITNESS:  Okay, got it.

12           MR. SMITH:  Exhibit A to Exhibit 3.

13           THE WITNESS:  I'm trying to draw a map to

14       describe what I think where there's confusion.

15           MR. BOYER:  Turn to -- turn to the end of

16       that Exhibit.  There you go.

17           THE WITNESS:  And I'm looking at this

18       exhibit.  I was showing all the different

19       properties.

20           I don't know why -- why it was that

21       Capricorn Studios is not listed.  We owned this

22       when we originally bought it, too.

23           Maybe there was a renewal of the note, but

24       let me try to show -- show you what I'm -- what

25       I'm talking about.

Page 31

```
 1  BY MR. GORDON:

 2      Q    Why don't we mark -- why don't we mark

 3  this as No. 25.

 4                  (Whereupon, marked by the court
                    reporter for identification purposes,
 5                  Exhibit No. 25.)

 6  BY MR. SMITH:

 7      Q    Hold on just one second.

 8      A    I think where there's confusion is that

 9  when we bought this tract of land from Mercer

10  University for $2,090,000, we bought 500 MLK, 506

11  MLK, the Capricorn Studios, which I believe is 534

12  MLK, 560 MLK, which is across the alley, and then

13  615 5th Street.

14              And what I'm confused about is that I

15  think we had two loans because of the fact that

16  maybe this was -- this was a separate -- I mean, it

17  was a parcel that was not contiguous to the

18  property, but it was always part of the original

19  tract.

20      Q    But the Security Deed at Exhibit 3 as you

21  look at it --

22      A    Right.

23      Q    -- it does not reference a property at 615

24  5th Street, correct?

25      A    That is correct.
```

1        **Q      Okay.**

2        A     So I guess the bank just let us have that

3   property for free.

4        **Q      Do you know if 615 5th Street was ever**

5   **foreclosed on?**

6        A     Yes.  Well, I assume it was.

7        **Q      Okay.  If you don't know or don't**

8   **remember, that's fine, too.  I'm just asking you**

9   **what your knowledge is.**

10       A     Okay.

11       **Q      I mean, I'm going to ask the question**

12  **again.**

13            **Do you know for certain that 615 5th**

14  **Street was foreclosed on?**

15       A     No.  And, as a matter of fact, last night

16  I looked at 560 MLK and it -- it said it was

17  foreclosed, but then there was no purchaser of it

18  like there is with these other shell companies that

19  the bank uses.

20            So I'm not really clear on how that works.

21       **Q      Okay.  And is it possible that Capricorn**

22  **might still own 615 5th Street?**

23       A     It could possible -- it could be possible.

24       **Q      Okay.  And when you said that on**

25  **February -- when I asked you about Paragraph 73 in**

1    the Complaint -- I'm going back now to Exhibit 19.

2        A    Okay.

3        Q    And -- yes, Page 10.

4        A    Okay.

5        Q    Your testimony, I believe, was something

6    to the effect that you thought the property that

7    secured Note 2 was worth more than what the bank

8    applied to the loan and that the bank owed the

9    company money because of that; is that correct?

10       A    That's correct.  But I would assume that

11   when a bank forecloses a piece of property that they

12   get the benefit of the asset.

13       Q    Right.  And that was going to be my next

14   question:  Do you have any reason to believe that

15   the bank did not -- and when I say "the bank" I mean

16   CertusBank.

17            Did CertusBank incorrectly apply the

18   foreclosure proceeds at that foreclosure sale?

19            In other words, did -- I know you disagree

20   with the value of what they sold it for.  You

21   thought it was worth more than what they sold it

22   for.

23       A    Yes.

24       Q    But do you have any reason to believe that

25   CertusBank didn't apply what they did sell it for at

 1   foreclosure?

 2        A    I can't answer that question.  I don't

 3   know.  I need to go back and look now.

 4             MR. BOYER:  Just for the record, we do

 5        contend there was a misapplication of payments

 6        because of the attorney fee invalidity, that

 7        monies were incorrectly applied to attorney's

 8        fees when there was not a valid attorney fee

 9        claim in the case.

10             He may not know that.

11             THE WITNESS:  No, I do not.

12             MR. SMITH:  Your legal position is noted

13        for the record.

14             THE WITNESS:  And what is your name?

15   BY MR. SMITH:

16        Q    So, as you sit here today, you don't know

17   whether the remaining principal amount factors what

18   the bank brought in at foreclosure of the properties

19   on Exhibit A to the Security Deed that's at Exhibit

20   3 or not?

21        A    I do not know.

22        Q    Okay.

23        A    But I would like to know.

24        Q    And just so I understand your argument or

25   your position as to why you think the bank owes you

1   money, it's not because you think the bank

2   foreclosed and misapplied the amount that it

3   foreclosed on.

4           You think the bank should have paid more

5   at the foreclosure or got someone to pay more at the

6   foreclosure, correct?

7       A    Yes.  I believe that the bank was fully

8   compensated at the sale, and I also believe that the

9   bank misled us into thinking that they were going to

10  continue to work with us as they had over the last

11  couple of years.

12          And let me go into more detail:  When

13  Mr. Clegg over and over told me that the property

14  would not have a deficiency, at the same time I

15  still thought the property and I still think the

16  property is much, much, much more valuable than what

17  the bank took it in for.

18          So I was fighting tooth and nail the

19  entire time to try to save the property.  So I

20  always thought the property was worth more money.

21          He had agreed with me the whole time until

22  the week before, and there was no way we could raise

23  $1.3 million in 7 days to buy the property in.

24          And they would -- they weren't willing to

25  renew the note, either, because over the past few

Page 36

1  months I had been paying large sums to try to keep

2  up with the interest and make payments, and they

3  knew that we were continuing to do that.

4       Q    And, again, it sounds like what you're

5  saying, just to sum up, you believe the bank should

6  have got more cash at the foreclosure sale than it

7  did?

8       A    I do.

9       Q    But you don't have any reason to believe

10 that the bid amount that the bank did make to bring

11 the property back was not applied to the outstanding

12 balance?

13      A    That's correct, okay.

14      Q    So your defense is based on the fact that

15 you think the property should have brought more than

16 it did?

17      A    Yes, but I -- but -- but I also think

18 that -- I think that maybe they haven't given us all

19 the credit that's potentially due for -- for the

20 sale of these -- all the properties combined.

21      Q    Okay.  And are you talking about the 615

22 5th Street?

23      A    That and the $50,000 that we gave them.

24      Q    And, again, you're not sure if they

25 foreclosed on 615 5th Street?

Page 37

1       A     That's correct.  But I --

**2       Q     And you're not sure if this amount, the**

**3    76,266 reflects proceeds from 615 Street or not, as**

**4    we sit here?**

5       A     That's correct.  Yeah, I don't know

6    there -- I mean, there's not a -- is there anything

7    in this document that shows the proceeds that came

8    in?

**9       Q     I'll represent to you that there is not.**

10      A     Okay.  So it's hard to answer when you

11   can't see the factual information.

**12      Q     But you do -- you admit that the note,**

**13   Note 2, was originally in excess of $1.2 million,**

**14   correct?**

15      A     Yes, I do.

**16      Q     And at the end of the day, in this**

**17   Complaint the bank is contending, of that**

**18   $1.2 million, there's only 76,266.82 left?**

19      A     Correct.

**20      Q     And without a breakdown you wouldn't know**

**21   whether that's correct or not?**

22      A     That's correct.  Thank you.  Okay.

23            MR. SMITH:  I don't have any other

24        questions of the deponent.

25            Wes?

Page 38

1          MR. BOYER:  No, I do not.

2          MR. SMITH:  Deposition of Mr. Dunwody and

3     Capricorn Center, LLC is concluded.  Thank you,

4     Mr. Dunwody.

5          THE WITNESS:  Thank you.

6                     (Deposition Concluded)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                 C E R T I F I C A T E

2                 - - - - - - - - - - -

3    STATE OF GEORGIA:

4    FULTON COUNTY:

5          I hereby certify that the foregoing

6    transcript was  taken down as stated in the caption,

7    and the questions and answers thereto were reduced

8    to typewriting under my direction; that the

9    foregoing pages 1 through 38 represent a true and

10   correct transcript of the evidence given upon said

11   hearing, and I further certify that I am not a

12   relative or employee or attorney or counsel of any

13   of the parties, nor am I a relative or employee of

14   such attorney or counsel, nor am I financially

15   interested in the action.

16          This the 1st day of December, 2014.

17

18                    _____
                      KELLY A. EMERY, CCR-B-941

19

20

21

22

23

24

25

**$**

**$1,286,369.29** 10:3, 20

**$1.2** 13:12 24:5 26:2, 10 27:14,15 29:19 37:13,18

**$1.3** 35:23

**$176,000** 9:18 13:3,6 24:9,13 25:20 29:6

**$176,452.13** 6:1,21 9:1

**$176,752.13** 23:23

**$2,090,000** 31:10

**$200,000** 15:19

**$241,280** 11:5 12:8

**$33,045** 8:25 12:16

**$50,000** 17:10,22 18:6,15 21:22 22:10 36:23

**$76,000** 25:22

**1**

**1** 5:20,22 9:18 24:12

**1.2** 27:14

**1.286** 25:19

**10** 9:23,25 33:3

**108,000** 25:1

**11** 10:13,15 12:5 13:13

**11.1** 5:8

**16** 11:8,10

**16th** 6:1,21 7:11 8:10 9:15 13:4,7

**17** 11:15,20,22

**176** 25:2

**176,752.13** 25:5

**17th** 17:4

**18** 24:22

**18th** 23:23 24:18 27:10,22

**19** 22:22,24 33:1

**2**

**2** 6:8,10,19 8:21 13:5, 6 24:24 27:12,13 29:18 33:7 37:13

**2007** 4:7

**2008** 7:11

**2010** 6:1,21 8:10 9:15

**2011** 10:3,19 11:11, 23 13:4,7

**2012** 13:15 16:18 17:4 20:1

**2014** 23:23 24:18,22 27:10,22

**22** 16:14,16

**22** 17:1,3

**23** 19:4,6

**24** 20:23,25 28:22

**25** 9:12 30:1 31:3,5

**28th** 10:3,19 11:11,23 13:15

**3**

**3** 7:5,7 30:9,12 34:20

**30(b)(6)** 3:4,20 4:2

**33.3** 5:6

**4**

**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** 12:2

**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** 12:12

**43** 23:18 24:11 25:4 28:6

**5**

**5.05** 5:10,14

**50** 9:8 23:15

**500** 31:10

**504** 15:18

**506** 31:10

**534** 9:8 31:11

**560** 9:8 31:12 32:16

**5th** 6:14 7:22 28:10, 20,22 29:4 31:13,24 32:4,13, 36:22,25

**6**

**6** 23:19

**615** 6:14 7:21 9:6,8 28:10,18,20,22 29:4 31:13,23 32:4,13,22 36:21,25 37:3

**7**

**7** 35:23

**73** 24:4,24 25:5 26:1, 27:9,19 32:25

**76** 24:10

**76,122** 24:10

**76,266** 25:6 37:3

**76,266.82** 37:18

**7th** 16:18

**9**

**9** 8:4,6 12:11

**A**

**abbreviated** 27:15

**Absolutely** 18:2

**accrued** 17:24 25:1 27:10,11

**actual** 14:7

**address** 9:7

**addressed** 16:19 23:2

**addresses** 30:6

**admit** 37:12

**agreed** 35:21

**agreement** 10:2 14:13

**ahead** 3:5

**alleged** 24:13,22

**alleging** 26:9

**Allen** 4:25

**alley** 31:12

**amount** 5:25 6:21 10:3,19 15:8 17:13 25:12 26:18,19 34:17 35:2 36:10 37:2

**amounts** 13:20,23 17:15,20 23:22 24:1, 4,8,23 26:12 27:18

**anymore** 4:22

**apologize** 11:15 28:4

**applied** 33:8 34:7 36:11

**apply** 33:17,25

**appraisal** 20:9

**appraisals** 15:15

**April** 6:1,21 7:11 8:10 9:15 10:3,19 11:11, 23 13:4,7,15

**argument** 34:24

**arrangements** 14:12 15:6 20:15

**asserted** 17:15,21

**asserting** 23:21 24:4

**asset** 33:12

**assume** 32:6 33:10

**Atlanta** 3:3

**Atlantic** 5:18 7:12 8:10 12:1,23

**attorney** 18:10 21:6 26:25 34:6,8

**attorney's** 34:7

**August** 16:18 17:4, 11

**avoid** 3:6

**B**

**back** 12:10,23,25 13:1,22 15:14 18:11 19:1 28:5,12,14 29:9, 10 33:1 34:3 36:11

**balance** 36:12

**Ballard** 4:25 5:9

**bank** 5:18 7:12 8:11 12:1 14:10 15:13 17:10 22:17 26:12,20 28:14 29:17 32:2,19 33:7,8,11,15 34:18, 25 35:1,4,7,9,17 36:5,10 37:17

**based** 26:4 36:14

**basically** 22:5

**behalf** 7:15 10:7

**believed** 29:16

**believing** 29:4

**benefit** 33:12

**bid** 16:8 36:10

**big** 16:17

**Bob** 4:25 27:1

**borrowed** 29:24

**bottom** 8:15

**bought** 15:13 28:14 29:9,10 30:22 31:9, 10

**boy** 16:17

**Boyer** 3:2,23,24 5:11 11:12 18:22 19:10 23:1,6,10,13 24:14, 20 30:10,15 34:4 38:1

**break** 18:9

**breakdown** 37:20

**bring** 36:10

**broken** 25:13

**brought** 34:18 36:15

**business** 4:9

**buy** 28:11 35:23

**C**

**call** 8:24

**called** 20:12

**cap** 8:24 9:1 12:8,15 13:22

**capacity** 4:1

**Capricorn** 3:21 4:3, 5,17 5:4,17 6:2,6,14, 15,17,24 7:3,11,15, 18 9:10 10:7,11,20, 24 12:22 28:17,23,24 29:3 30:21 31:11 32:21 38:3

**caps** 12:19

**case** 34:9

**cash** 16:13 36:6

**Center** 3:21 4:3,5 5:17 6:2,6,14,15,17, 24 7:3,11,18 9:10 10:7,11,20,24 12:22 28:23,24 38:3

**Certusbank** 19:15, 24 33:16,17,25

**Certusbank's** 29:8

**cetera** 8:25

**change** 13:13 14:14

**changed** 14:8

**charges** 25:1 27:11

**check** 18:6 21:25

**claim** 34:9

**clarify** 20:16 24:14

**clear** 32:20

**Clegg** 14:3 19:24 35:13

**closed** 15:20

**collateral** 16:6 20:10

**combined** 36:20

**comment** 6:12

**Commercial** 10:2

**communication** 19:15,19 20:18

**companies** 22:3 32:18

**company** 8:2 33:9

**compensated** 35:8

**Complaint** 23:19 25:16,17 33:1 37:17

**concern** 6:12

**concluded** 38:3,6

**confirming** 22:6

**confused** 26:21 31:14

**confusion** 28:4 29:20 30:14 31:8

**connection** 9:21

**Connors** 4:20 5:6 6:2,25 7:14 10:6,21

**contend** 34:5

**contended** 27:21

**contending** 26:1,12 37:17

**contiguous** 31:17

**continue** 35:10

**continuing** 36:3

**contracts** 15:9

**conversations** 14:16 20:1

**convince** 18:4

**copied** 21:14,16

**copy** 6:5 7:2,17 10:10,23 14:9 16:20, 23 17:7 19:8,23 23:5

**corporate** 3:20

**corporation** 29:8

**correct** 3:1,23,24 6:3,4,5,22 7:2,12,13, 15,17 8:3,11 9:16,18 10:4,5,8,10,21,22, 11:23 12:2,5,8,13,14, 16,17 19:23 21:7,20 22:11,12,15,16,21 23:4 26:15,18,19 31:24,25 33:9,10 35:6 36:13 37:1,5,14, 19,21,22

**correspondence** 21:3

**counsel** 19:2 21:7,11

**couple** 19:2 35:11

**court** 5:13 19:5 20:20,22 31:4

**Cox** 3:17

**credit** 23:15 28:11 36:19

**credited** 17:12 18:18

---

**D**

**date** 7:9 13:4,7,14,17 17:16,20 22:10

**dated** 6:1,20 7:10 9:2,15,17 10:2,18 11:23 16:18 17:4

**David** 18:11,13

**day** 9:2,17 12:13 13:10 22:20 37:16

**days** 35:23

**debating** 16:1

**debt** 7:8,10,20,21 25:13

**decades** 4:13

**deed** 7:8,10,19,21 28:17 31:20 34:19

**defense** 36:14

**deficiency** 14:2,23 15:1,2 19:16,17 20:4, 8 35:14

**deponent** 30:3 37:24

**depose** 23:8

**deposed** 3:11

**deposition** 3:3 19:14 38:2,6

**describe** 30:14

**designated** 3:19,20

**detail** 35:12

**details** 4:23

**develop** 4:12

**disagree** 33:19

**discussion** 3:9,18 18:24 27:5 29:13

**dispute** 26:18

**doc** 20:6

**document** 6:6,25 7:3,18 8:1 10:6,11,24 19:22 21:9 23:5,14 37:7

**documents** 19:2

**dollars** 14:20 16:13

**credited** 17:12 18:18

---

**downtown** 4:11,13 29:1

**draw** 30:13

**drawing** 30:3

**due** 36:19

**duly** 3:11

**Dunwody** 3:10,17,25 4:5 5:7 11:22 19:3,13 29:15 38:2,4

---

**E**

**E-mail** 14:6,24 19:19, 23 20:6,17 21:1,5,17, 18,19 22:6,18 23:2

**earlier** 5:17 12:11 15:5 19:14 26:11 27:16

**effect** 20:18 33:6

**effected** 14:14

**end** 30:15 37:16

**ensued** 3:9 18:24 27:5 29:13

**entered** 5:20 6:8 7:5 8:4 9:23 10:13 11:8, 20 16:14 17:1 22:22

**entire** 35:19

**entities** 22:7

**entity** 4:3,8,18 10:8 29:2

**estate** 29:9

**Eugene** 3:10,17

**EXAMINATION** 3:13

**exceed** 8:25

**exception** 17:22

**excess** 37:13

**exchange** 22:10

**exhibit** 5:20,22 6:8, 10,19 7:5,7 8:4,6 9:18,23,25 10:13,15 11:8,10,15,20,22 12:5,11 13:5,6,13 16:14,16 17:1,3 19:6 20:23 22:24 28:22 30:1,9,10,12,16,18 31:5,20 33:1 34:19

---

**exhibits** 7:24 22:22 30:6

**extra** 28:1

---

**F**

**fact** 32:15 36:14

**factors** 34:17

**factual** 37:11

**favor** 7:12 8:10 11:25

**February** 23:23 24:18,22 27:10,22 32:25

**fee** 34:6,8

**feel** 28:8

**fees** 25:1 27:11 28:1 34:8

**felt** 14:4

**fighting** 35:18

**find** 7:8

**fine** 32:8

**firm** 21:6

**flip** 8:6

**foreclose** 14:1 18:4

**foreclosed** 15:21 20:10 22:14 32:5,14, 17 35:2,3 36:25

**forecloses** 33:11

**foreclosing** 18:6,16

**foreclosure** 14:7 15:22,24 17:11 20:13 22:10 28:1 33:18 34:1,18 35:5, 36:6

**foreclosures** 16:1,2 21:21 22:7,19

**formal** 14:13 18:18

**formed** 4:6

**forward** 16:7, 22:9, 19

**free** 32:3

**front** 21:9

**fully** 35:7

**funny** 15:18

**G**

gave  17:10 36:23

general  4:19

give  18:5,15 20:21
23:13

good  18:2

GORDON  31:1

graciously  19:3

Greenberg  21:6

group  4:10,15 5:5

Guaranties  12:19,20

guarantors  13:21

guaranty  8:9 9:10,
11,14,20 11:2,3,11,
13,18,22,25 12:7,11,
12

guess  29:7 32:2

**H**

hand  19:9

handed  23:2

happen  15:5

hard  23:13 37:10

held  5:3 6:16

historic  4:17 29:1

Hold  31:7

Hollingsworth
18:11

honor  22:17

**I**

idea  4:16

identification  19:5
20:22 31:4

included  20:8

including  8:19 13:21
16:19

incorrect  17:21 24:1,
8 26:15 27:22,23

incorrectly  33:17

34:7

indication  15:17

individual  4:1

individuals  4:10

information  37:11

initials  8:15

interest  5:4 14:21
17:24 27:11 36:2

interested  4:10

invalidity  34:6

**J**

Jack  4:25

Jenkins  4:25 5:7

Jr  3:10,17

July  20:1

Justice  4:25 5:9

**K**

kind  5:3 18:13

kinds  20:14

knew  15:21 36:3

knowledge  22:17
32:9

**L**

land  31:9

language  8:20

large  36:1

left  26:2 37:18

legal  30:3 34:12

lent  12:23

letter  16:18,21,24
17:4,8,16 18:13,18

letters  17:14,20

liability  8:18,24 9:5

limited  8:18 9:5,10,
11 11:2,18

listed  30:21

LLC  3:21 5:17 6:2,6,
24 7:3,11,18 10:7,11,
20,24 12:22 38:3

loan  6:14 8:19 9:9
10:2 13:10 19:18
28:5,10 29:5,6,17
33:8

loans  5:18 29:24
30:6 31:15

Long  5:1,7

looked  32:16

Lovett  5:1,7 27:1,2

**M**

Macon  4:11

make  6:12 14:11 15:6
20:14 36:2,10

manager  6:25 10:7,
21

managing  4:24

map  30:13

mark  14:3 19:4 20:25
31:2

marked  5:20 6:8 7:5
8:4 9:23 10:13 11:8,
20 16:14 17:1 19:5
22:22 31:4

market  15:19

mathematically
26:22

matter  32:15

mature  13:10,17

maturity  13:4,7,14

members  4:18

membership  5:3

memory  4:22

mentioned  5:3,17
6:13 9:7 20:3 21:12

Mercer  4:14 31:9

Mike  17:23

million  13:12 14:20
16:13 24:5 25:19
26:2,10 27:14,15
29:19 35:23 37:13,18

mind  14:8

minute  3:8 21:1

misapplication  34:5

misapplied  35:2

misled  14:5 35:9

mistake  20:5

MLK  15:19 31:10,11,
12 32:16

money  12:23,25 13:1
15:7,16,21 18:14,18
29:24 33:9 35:1,20

monies  13:22 34:7

months  14:4 15:5
36:1

**N**

nail  35:18

night  32:15

note  5:25 6:20 9:2,
18,21 10:18 11:4
12:2,4,7,12,15 13:3,
6,12,13,17 23:22,23
24:5,6,9,12,13,24
25:15,20,23 26:2,11
27:12,13,15 29:18,19
30:23 33:7 35:25
37:12,13

noted  34:12

notes  9:3 12:20 13:2,
20 16:6 17:16,24
18:1 25:10,13,18

November  20:2

number  28:8

**O**

open  15:22,24

order  7:23

original  31:18

originally  24:9 30:22
37:13

outstanding  17:15
23:22 24:4,8,23
26:12 27:11,21 36:11

owed  14:19 15:7,11
28:3 29:11 33:8

owes  34:25

owing  13:20

owned  4:14 5:6,7,9
22:8 29:1,3,25 30:21

ownership  9:12

**P**

pad  30:4

paid  12:25 13:1 14:19
17:23,24 28:2 35:4

Paragraph  23:18
24:4,11,24 26:1,
27:9,18 32:25

parcel  31:17

parcels  28:25

part  6:15 31:18

parties  14:14 16:19
17:5

partner  4:19,24 8:18
9:5,11

past  20:3 35:25

pay  13:22 28:16 35:5

paying  14:21 36:1

payment  17:25
21:22

payments  34:5 36:2

people  5:2 11:19
16:12

percent  5:6,8,10,14
9:12

percentage  9:12

person  5:5

personally  13:22

phone  18:11

piece  28:12,24 29:21
33:11

plan  29:25

point  8:17 22:14
24:15 29:7

pointing  8:22

poorly  16:2

position  34:12,25

**positive** 7:20

**possibly** 4:16

**postpone** 20:13

**potentially** 36:19

**presence** 18:3

**previously** 5:20 6:8
7:5 8:4 9:23 10:13
11:8,20 16:14 17:1
20:7 22:22

**principal** 10:19 25:4,
6 27:10,19,21 34:17

**principals** 25:2

**problem** 13:25

**proceeds** 33:18
37:3,7

**produced** 20:20

**profit** 28:15

**project** 4:23 5:7 9:4
23:16

**promissory** 5:25
6:20 10:18

**properly** 17:12

**properties** 15:18
18:7 21:21 22:1 30:7,
19 34:18 36:20

**property** 4:12,14,15
6:16 14:12,18 15:8,9
18:5,16 20:9 22:8
27:25 28:2,10,12,25
29:2,3,9,10,16,22
31:18,23 32:3 33:6,
11 35:13,15,16,19,
20,23 36:11,15

**provide** 19:7

**provided** 19:3,10

**public** 15:23 16:7,10

**purchased** 4:15 29:2

**purchaser** 32:17

**purpose** 4:8

**purposes** 5:16 19:5
20:22 31:4

**put** 15:3,19

**Q**

**question** 11:7 18:2
25:25 26:13 27:17
32:11 33:14 34:2

**questions** 27:8
37:24

**R**

**raise** 35:22

**read** 21:2,18

**real** 29:8

**realize** 11:19

**reason** 13:9,16 16:5
17:19 21:15 23:4,25
24:7 26:14,17 27:18,
20 28:22 33:14,24
36:9

**recall** 4:6 9:13 16:20
17:7,9

**received** 14:6 16:24
19:23

**receiving** 16:20 17:7

**recollection** 21:2

**record** 3:8,9,16,19
6:13 18:22,24 23:1
26:21,23 27:2,4,5
29:12,13 30:2 34:4,
13

**redeveloping** 4:16

**redevelopment**
4:11 5:16

**reference** 31:23

**referenced** 12:1,4,
20

**references** 12:12
13:3,7

**referencing** 22:18

**referring** 19:20
24:12,15 27:14

**reflect** 26:24 30:2

**reflects** 37:3

**refresh** 21:2

**regard** 21:21

**relate** 9:1 12:19

**related** 9:3

**remaining** 34:17

**remember** 17:13
20:19 32:8

**remind** 11:17

**renew** 35:25

**renewal** 30:23

**rephrase** 25:24

**reporter** 5:13 19:5
20:22 31:4

**represent** 25:17 37:9

**representative** 3:21
4:2

**Rob** 4:25

**Ron** 7:14 10:6,21

**Ronald** 4:20

**room** 18:10 26:24
27:3

**S**

**sale** 15:22 16:5,9
33:18 35:8 36:6,20

**save** 35:19

**saving** 4:16

**Section** 8:21

**Secure** 7:8,10,19,21

**secured** 16:6 33:7

**security** 28:17 31:20
34:19

**sell** 33:25

**Senior's** 11:13

**separate** 31:16

**set** 27:18

**shell** 29:8 32:18

**show** 30:24

**showing** 30:18

**shows** 37:7

**sign** 6:24 9:20 28:17

**signature** 8:13

**signed** 6:2,6 7:3,11,
14,18 8:2,9 9:10
10:6,11,20,24 11:11,
23 12:13 14:14

**single** 9:9

**sir** 6:23 8:22

**sit** 34:16 37:4

**site** 29:25

**skipped** 16:17

**SMITH** 3:7,14,23,25
4:4 5:15,21 6:9 7:6
8:5 9:24 10:14 11:9,
14,21 16:15 17:2
18:25 19:9,12 20:24
22:23 23:8,11, 24:17,
21 25:9 27:1,6 29:12,
14 30:8,12 31:6
34:12,15 37:23 38:2

**sold** 33:20,21

**sounds** 36:4

**Southern** 5:18 7:12
8:10 12:1,24

**stall** 17:10

**standing** 4:19

**start** 27:8,19

**state** 3:15

**stated** 13:14 14:24
24:8

**stating** 18:14

**street** 6:14 7:22
28:11,18,19,20,22
29:4 31:13,24 32:4,
14, 36:22,25 37:3

**Studios** 4:17 30:21
31:11

**stuff** 15:13

**subpoenaed** 3:3

**suggests** 20:6

**suing** 25:18

**sum** 36:5

**sums** 36:1

**sworn** 3:11

**T**

**talk** 29:15,19

**talking** 8:20 9:6
14:15 24:24 30:25
36:21

**technically** 28:15

**telling** 14:25

**terms** 21:20 22:19

**testified** 3:11 13:2
17:18 19:13 24:12
25:18 26:11 27:16

**testify** 3:21

**testifying** 4:1 25:19

**testimony** 33:5

**thing** 20:3

**thinking** 35:9

**thought** 3:2 19:17
28:5 33:6,21 35:15,
20

**threatening** 14:1

**tied** 28:23 29:21

**time** 15:3,25 17:23
21:24 23:13 24:15
28:1 29:3,23 35:14,
19,21

**today** 3:22 4:1,21
15:11 23:24 34:16

**told** 13:25 14:3,17
15:14 18:19 20:7
21:23 35:13

**Tony** 5:1

**tooth** 35:18

**top** 13:14

**total** 28:13 29:7

**tract** 31:9,19

**trick** 27:7

**true** 6:5 7:2,17 10:10,
16:23 19:22 23:4

**turn** 5:22 6:10,19 7:7
9:25 10:15 11:10
16:16 17:3 22:24
23:18 30:9,15

**type** 4:9

## U

**uh-huh** 22:4

**understand** 13:24
25:3 34:24

**understanding**
12:18 13:19 21:20
22:13 29:5

**University** 4:15
31:10

**unpaid** 27:10

## V

**vacant** 4:13

**valid** 34:8

**valuable** 35:16

**verbal** 14:23

## W

**wait** 11:6

**walked** 26:24 27:2

**walking** 16:13

**wanted** 8:17 16:7

**week** 14:6,24 35:22

**Wes** 11:16,17 18:11
19:7 21:12 37:25

**Wing** 17:23 21:6,19
22:5,18 23:5

**Wing's** 18:3

**words** 33:19

**work** 35:10

**working** 15:11

**works** 32:20

**world** 16:12

**worth** 14:19 15:8,10,
15,21 28:2 29:16
33:7,21 35:20

**written** 14:13 19:14,
19 20:17,18

**wrong** 28:8 29:6

## Y

**years** 14:21 35:11

**yellow** 30:3

**you-all** 26:4